**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TEXAS MEDICAL SUPPLY LLC, JAD SHRAIM, OMARI SHAFRAN, DIMITRI MENIN,<br><br>      Plaintiffs,<br><br>  v.<br><br>AVRUMI LUBIN,<br><br>      Defendant. | Civ. A. No.: |

## COMPLAINT

Plaintiffs Texas Medical Supply LLC, Jad Shraim, Omari Shafran, and Dimitri MMenin, as and for their Complaint against Avrumi Lubin ("Lubin"), state as a follows:

## NATURE OF THE ACTION

1. This is a RICO action against a predatory lender who operates an unlawful lending enterprise ("the Enterprise") through a sham merchant cash advance ("MCA") company ("Spin Capital, LLC").

2. Texas Medical is a startup business that provides necessary medical and personal protective equipment to frontline workers, hospitals, and first responders.  It also employs veterans, second chancers and legal foreign refugees.

3. At a time when our country is struggling to stay open and desperately needs domestic businesses like Texas Medical to fight the pandemic, Lubin is trying to single handedly destroy the business and shut it down by attempting to extort illegal and unconscionable interest through his operation of an unlawful RICO Enterprise.

4.     In sum and substance, the Enterprise advanced Texas Medical $900,000 under two sham agreements falsely labeled Revenue Purchase Agreements on May 25, 2021 and June 16, 2021.  On the face of the two sham agreements, Texas Medical was to repay $1,439,000 through fixed weekly payments totaling $90,000.  Thus, on the face of the agreements, Texas Medical was to repay the amount advanced in just 16 weeks, resulting in an unconscionable and unlawful simple interest rate of 195%.

5.     The maxim interest allowed under New York law, the controlling law of the agreements, is 25%.  The maxim amount permitted under Texas law is 28%.

6.     Indeed, a member of New York's highest court, just recently noted in *dicta* that transactions like here more closely resemble loans subject to New York's usury laws rather than bona fide sales of receivables:

> Although the GTR and CMS agreements are described as "factoring" agreements, they do not bear several of the hallmarks of traditional factoring arrangements, in that FutureNet did not sell any identifiable receivable to GTR or CMS; GTR and CMS did not collect any receivables; GTR and CMS received fixed daily withdrawals from FutureNet's bank account regardless of whether or how much FutureNet collected from or billed to its clients; and GTR and CMS did not bear the risk of nonpayment by any specific customer of FutureNet. The arrangements FutureNet entered with GTR and CMS appear less like factoring agreements and more like high-interest loans that might trigger usury concerns (*see Adar Bays, LLC v GeneSYS ID*, — NE3d —, 2021 NY Slip Op 05616 [2021]). Nevertheless, for the purpose of these certified questions, we are asked to assume the judgments rendered on those agreements are valid.

*Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 2021 N.Y. LEXIS 2577, *45, 2021 NY Slip Op 07055, 11, 2021 WL 5926893 (N.Y. Dec. 16, 2021).

7.     Of course, the transactions here were always meant to be loans and not sales of receivables, and the parties performed just as if the transactions were loans.

8.     To be sure, because Texas Medical could not payback the amount advanced due to the loss of its most significant government contract (a risk assumed by the purchaser in a true

sale of receivables), the Enterprise unleashed its collections arm to extort payment from Texas Medical and its individual owners Shraim, Shafran, and Menin.

9.      Among other unscrupulous tactics, the Enterprise sent UCC Lien Letters to various third parties, many of which owed no accounts receivables to Texas Medical.  Even worse, the Enterprise sent out the same UCC Lien Notices to various companies individually owned by Shraim, Shafran, and Menin.  These unlawful actions have caused, and continue to cause, irreparable damage to their reputation and businesses.

10.     As a direct result of these extortionate collection tactics, Plaintiffs, through one of Spin Capital's principals, Joel Getter, ultimately agreed to capitulate and repay a total of $1.4 million over a two-year period.  The interest rate of the settlement was just under 25%.

11.     A true and correct copy of the signed Settlement Agreement, and email from Spin Capital's counsel confirming the settlement, is attached as Exhibits A and B.

12.     Apparently, securing a lawful interest rate was not enough for Lubin.  After the parties to the actual contract had agreed upon a settlement, Lubin exercised his control over the Enterprise by instructing Spin Capital's counsel to retract the already agreed upon settlement. Ex. C.  In doing so, Lubin demanded additional interest payments and a shorter term.

13.     Lubin's direct control and influence over the Enterprise could not be clearer.  Attached as Exhibit D is a true and correct copy of text exchanges directly with Lubin, Getter, and Plaintiffs. These text messages demonstrate that Lubin both (i) controlled the Enterprise, and (ii) sought to extract criminally usurious interest in violation of controlling New York law.

14.     Below is the text exchange between Lubin and Shraim (a Philadelphia resident):



15.     This demand brazenly tacked on more interest and shortened the term, resulting in a criminally usurious interest rate in excess of 42%.

16.     Under controlling New York law, the agreement is thus void ab initio.  *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 2021 LEXIS 2206, 2021 Slip Op. 05616, 2021 WL 4777289 (N.Y. Oct. 14, 2021).

17.     This action seeks damages for Lubin's collection of the unlawful debt, and a permanent injunction enjoining Lubin from engaging in future unlawful conduct.

## THE PARTIES

18.     Plaintiff Texas Medical Supply is limited liability company that is organized under the laws of Texas, and located in Texas.  Its members are citizens of Texas and Pennsylvania.

19.     Jad Shraim is an individual who resides in Philadelphia and is a citizen of Pennsylvania.

4

20.    Omari Shafran is an individual who resides in Texas and is a citizen of Texas.

21.    Dimitri Menin is an individual who resides in Texas and is a citizen of Texas.

22.    Avrumi Lubin is an individual who resides in New Jersey.

## JURISDICTION

23.    This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S. C. §§ 1961–68.

24.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred here.

25.    Defendant is subject to the personal jurisdiction of this Court because Defendant has purposefully availed himself of the specific jurisdiction of this Court by, among other things, knowingly and purposely attempting to collect upon an unlawful debt from a resident and citizen of Pennsylvania.

## FACTUAL ALLEGATIONS

### A.    The Predatory MCA Industry

26.    The Merchant Cash Advance ("MCA") industry spawned from the 2008 Financial Crisis.  One of the earliest MCA companies, Yellowstone Capital LLC, was co-founded in 2009 by David Glass, an inspirational character for the movie "Boiler Room."[1]  As Mr. Glass confessed to Bloomberg News, "it's a lot easier to persuade someone to take money than to spend it buying stock."  Just like in the movie, MCA companies utilize high-pressure boiler room tactics, employing salespersons with absolutely no financial background whatsoever.

---

[1] https://www.sec.gov/litigation/admin/2008/34-58574.pdf

27.    As Bloomberg previously reported, the MCA industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[2]  The MCA industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy." *Id.*  As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage.  There's no license you need to file for.  It's pretty much unregulated." *Id.*

**B.    The Sham.**

28.    Many states, like New York, have laws prohibiting the predatory interest rates. In order to evade these criminal usury laws, MCA companies disguise their agreements as "purchases of future receivables."  MCA companies promote a fiction that, rather than making loans to merchants, they are purchasing, at a discount, a fixed amount of the merchant's future receivables, usually to be repaid through a fixed daily or weekly payment that purportedly represents a percentage of the merchant's receipts.  The form of the contract thus allows MCAs to represent to courts that they, not the merchants, assume the risk that the merchants will fail to generate receivables. But the picture they paint is contrary to reality.  By operation of their agreements' default rights and remedies, the MCA companies exert complete control over the relationship and compel their merchants to make the fixed payments or suffer the consequences.

**C.    The Bloomberg Awakening.**

29.    For nearly a decade, MCAs operated under the radar of regulators, compiling over 25,000 confessions of judgment against small businesses and their individual owners.  That all changed on November 20, 2018 when Bloomberg News and renowned journalist Bethany

---

[2] https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.

McLean published what would be the first in a series of groundbreaking news articles exposing the abuses of the predatory MCA industry.[3]

30.    As a direct result of the light shined on these abuses, the New York Legislature quickly enacted legislation extinguishing their weapon of mass destruction, the confession of judgment, expressly citing the Bloomberg articles as its inspiration.

31.    Congress also took notice.  On June 26, 2019, the United States House of Representatives held a hearing titled:  "Crushed by Confessions of Judgment:  the Small Business Story."[4]  As explained by Professor Hosea Harvey from Temple University, small businesses are just as susceptible to predatory lending as unsophisticated individuals.[5]

32.    Regulators have also taken action.  On July 31, 2020, the New York Attorney General brought suit against a group of MCA companies, as well as their principals, alleging that their MCA agreements constitute criminally usurious loans.[6]

33.    On July 31, 2020, the Securities and Exchange Commission shut down an MCA company located right here in Philadelphia.  In its complaint, the SEC alleged that Par Funding "made opportunistic loans, some of which charged more than 400% interest, to small businesses across America."[7]  The FBI soon thereafter raided its offices, confiscating a cache of guns, millions of dollars in cash, and a private airplane.[8]

---

[3] *https://www.yahoo.com/entertainment/merchant-cash-advances-salvation-small-businesses-payday-lending-reincarnate-161835117.html*
[4] *See* Declaration of Shane R. Heskin, dated Mar. 11, 2021, Ex. 1.
[5] https://www.congress.gov/event/116th-congress/house-event/LC64251/text?s=1&r=60
[6] https://ag.ny.gov/press-release/2020/attorney-general-james-sues-predatory-lender-threatened-violence-and-kidnapping
[7] https://www.sec.gov/litigation/litreleases/2020/lr24860.htm
[8] https://www.inquirer.com/news/par-funding-better-financial-plan-joseph-laforte-dean-vagnozzi-20200731.html

34.     On August 3, 2020, the Federal Trade Commission filed a complaint against David Glass's company Yellowstone.[9]   Notably, the FTC complained that Yellowstone "unlawfully withdrew millions of dollars in excess payments from their customers' accounts, and to the extent they provided refunds, sometimes took weeks or even months to provide them." *Id.*

35.     On November 10, 2020, the California Commission of Financial Protection and Innovation entered into a Consent Order with Allup Financial LLC, finding that its MCA agreements were lending transactions subject to the California Finance Lenders Law, and barring the MCA company from doing business in California unless and until it complies with its laws.[10]

36.     On December 8, 2020, New Jersey also filed suit against Yellowstone, alleging it cheated "financially-strapped small businesses and their owners out of millions of dollars nationwide by luring them into predatory loans disguised as cash advances on future receivables with interest rates far exceeding the interest rate caps in the State's usury laws."[11]

37.     On December 23, 2020, New York signed into law the Small Business Truth in Lending Law, which is aimed at "protecting small business owners," and "requires key financial terms such as the amount financed, fees and annual percentage rate (APR) to be disclosed at the time a credit provider or broker makes an offer of financing of $500,000 or less."[12]

**D.     The Sea Change in Law.**

38.     Prior to the Bloomberg Awakening, courts routinely rejected attempts by small business victims seeking to vacate the many thousands of confessions of judgments filed by MCA companies.  Courts primarily denied those attempts on the procedural basis that a plenary

---

[9] https://www.ftc.gov/news-events/press-releases/2020/08/ftc-alleges-merchant-cash-advance-provider-overcharged-small

[10] https://dfpi.ca.gov/wp-content/uploads/sites/337/2020/11/Consent-Order-Allup-Finance-LLC.pdf.

[11] https://www.njoag.gov/ag-grewal-files-suit-against-yellowstone-capital-llc-and-associated-companies-alleging-the-merchant-cash-advance-companies-targeted-small-businesses-with-predatory-lending-and-abusive-collection-pract/

[12] https://www.jdsupra.com/legalnews/gov-cuomo-signs-new-york-small-business-9450503/

action must be filed instead of merely seeking to vacate by motion. One court went so far as to sanction the attorney for even bringing the motion. *See, e.g., Yellowstone Capital LLC v. Central USA Wireless LLC*, 2018 N.Y. Misc. LEXIS 2516, *2 (N.Y. Sup. Ct., Erie Cty Jun. 25, 2018) (citing *Yellowstone Capital, LLC v. Jevin*, Index No. 802457/2017 (N.Y. Sup. Ct. Erie Co. Oct. 6, 2017)).

39.     The tide has since turned in the wake of the Bloomberg articles. Most notable is the decision by Judge Nowak, a Commercial Division Justice out of Erie County—a favorite forum for MCAs given Upstate New York's more conservative political leanings.[13]   *See McNider Mar., LLC v Yellowstone Capital, LLC*, 2019 N.Y. Misc. LEXIS 6165 (N.Y. Sup. Ct., Erie Cty Nov. 19, 2019). Notably, Judge Nowak reversed his own prior decision in *Yellowstone Capital, LLC v. Jevin*, *supra*, where he previously held that the very same Yellowstone agreement was not a loan as a matter of law. This time, upon further reflection, Judge Nowak not only upheld the claims of usury, but also upheld the RICO claims. Numerous courts have followed suit. *See, e.g., Davis v. Richmond Capital Group*, 194 A.D.3d 516 (1st Dept. 2021); *NRO Boston LLC v. Yellowstone Capital LLC*, 2021 N.Y. Misc. LEXIS 1892 (Rockland Cty, April 9, 2021) (upholding RICO claims); *LG Funding LLC v. United Senior Properties of Olathe LLC,* 122 N.Y.S.3d 309 (2d Dep't. 2020); *Matter of AH Wines Inc., v. C6 Capital Funding LLC*, 2020 N.Y. Misc. LEXIS 4642 (N.Y. Sup. Ct. Ont. Cty. Aug. 19, 2020); *American Resources Corp. v. C6 Capital, LLC*, 2020 N.Y. Misc. LEXIS 10725, *6 (N.Y. Sup. Ct., Kings Cty. Dec. 16, 2020); *Funding Metrics LLC v. NRO Boston*, 2019 N.Y. Misc. LEXIS 4878 (N.Y. Sup. Westch. Cty. Aug. 28, 2019); *Funding Metrics, LLC v. D & V Hospitality*, 62 Misc.3d 966 (N.Y. Sup. Westch. Cty. Jan. 7, 2019).

---

[13] Notably, FundKite also appears to be forum shopping, choosing to file suit in Upstate New York instead of its home of Manhattan, apparently fearing the more liberal political leanings of its own residence.

40.     Numerous federal courts, including from this District, have also joined the revolution.  *See Fleetwood Servs., LLC v. Ram Capital Funding LLC*, 2021 U.S. Dist. LEXIS 94381 (S.D.N.Y. 2021) (upholding RICO claims under MCA agreement); *Fleetwood Servs., LLC v. Complete Bus. Sols. Grp*., 374 F.Supp.3d 361 (E.D. Pa. 2019) (same); *NRO Boston v. Funding Metrics*, 2018 U.S. Dist. LEXIS 239152 (E.D. Pa. May 23, 2018) (same); *Davis v. Richmond Capital Group*, 194 A.D.3d 516 (1st Dept. 2021); *NRO Boston LLC v. Yellowstone Capital LLC*, 2021 N.Y. Misc. LEXIS 1892 (Rockland Cty, April 9, 2021) (upholding RICO claims);

   **D.     The MCA Agreement Are Substantively And Procedurally Unconscionable.**

41.     The Enterprise agreements (the "MCA Agreements"), including the ones entered into by the Plaintiffs, are unconscionable contracts of adhesion that are not negotiated at arms-length.

42.     Instead, they contain one-sided terms that prey upon the desperation of the small business and their individual owners and help conceal the fact that the transactions (collectively, the "Transactions"), including those involving the Plaintiffs, are really loans.

43.     Among these one-sided terms, the MCA Agreements include:  (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, (3) moving or selling the business or any assets without permission from the MCA company, (4) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (5) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of

which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition of obtaining financing from other sources, (11) the maintenance of business interruption insurance, (12) an assignment of lease of merchant's premises in favor of the MCA company, (13) the right to direct all credit card processing payments to the MCA company, (14) a power-of-attorney "to take any and all action necessary to direct such new or additional credit card processor to make payment to Yellowstone," and (15) a power of attorney authorizing the MCA company "to take any action or execute any instrument or document to settle all obligations due…."

44. The MCA Agreements are also unconscionable because they contain numerous knowingly false statements. Among these knowingly false statements are that: (1) the transaction is not a loan, (2) the daily payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring the MCA company to charge an exorbitant ACH Program Fee or Origination Fee.

45. The MCA Agreements are also unconscionable because they are designed to fail. Among other things, the MCA Agreements are designed to result in a default in the event that the merchant's business suffers any downturn in sales by (1) forcing the merchant to wait until the end of the month before entitling it to invoke the reconciliation provision, (2) preventing the merchant from obtaining other financing, (3) and requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant.

46. The MCA Agreements also contain numerous improper penalties that violate New York's strong public policy. Among these improper penalties, the MCA Agreements (1)

entitling the MCA company to liquidated attorneys' fees based on a percentage of the amount owed rather than a good-faith estimate of the attorneys' fees required, (2) accelerate the entire debt upon an Event of Default, and (3) require the merchant to turn over 100% of all of its receivables if it misses just one fixed daily payment.

**E.    The Enterprise Uses a Sham Reconciliation Provision to Disguise the Loans.**

47.    In order to evade state usury laws, the Enterprise includes a sham reconciliation provision to give the appearance that the loans do not have a definite term.

48.    Under a legitimate reconciliation provision, if a merchant pays more through its fixed daily payments than it actually received in receivables, the merchant is entitled to seek the repayment of any excess money paid.  Thus, if sales decrease, so do the payments.

49.    For example, if an MCA company purchased 25% of the merchant's receivables, and the merchant generated $100,000 in receivables for the month, the most that the MCA company is entitled to keep is $25,000.  Thus, if the merchant paid $40,000 through its daily payments, then the merchant is entitled to $15,000 back under the sham reconciliation provision.

50.    In order to ensure that a merchant can never use their sham reconciliation provision, however, the Enterprise falsely represents that the fixed daily payment amount is a good-faith estimate of the percentage of receivables purchased.  By doing so, the Enterprise ensures that if sales decrease, the required fixed daily payments remain the same.

51.    For example, if 25% of a merchant's actual monthly receivables would result in a daily payment of $1,000, the enterprise falsely states that the good-faith estimate is only $500 per day so that if sales did in fact decrease by 50%, the merchant would not be able to invoke the reconciliation provision.

12

52.     On information and belief, the Enterprise does not have a reconciliation department, does not perform reconciliations, and has never refunded a merchant money as required under their sham reconciliation provision.

**E.     The Enterprise Intentionally Disguised the True Nature of the Transaction.**

53.     Despite their documented form, the Transactions are, in economic reality, loans that are absolutely repayable.  Among other hallmarks of a loan:

(a)     The Daily Payments were fixed and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws.  Rather, just like any other loan, the Purchased Amount was to be repaid within a specified time;

(b)     The default and remedy provisions purported to hold the merchants absolutely liable for repayment of the Purchased Amount.  The loans sought to obligate the merchants to ensure sufficient funds were maintained in the Account to make the Daily/Weekly Payments and, after a certain number of instances of insufficient funds being maintained in the Account, the merchants were in default and, upon default, the outstanding balance of the Purchased Amount became immediately due and owing;

(c)     While the agreements purport to "assign" all of the merchant's future account receivables to the Enterprise until the Purchased Amount was paid, the merchants retained all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof.  Indeed, rather than purchasing receivables, the Enterprise merely acquired a security interest in the merchant's accounts to secure payment of the Purchased Amount;

(d)     The transaction was underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(e)     The Purchased Amount was not calculated based upon the fair market value of the merchant's future receivables, but rather was unilaterally dictated by the Enterprise based upon the interest rate it wanted to be paid.  Indeed, as part of the underwriting process, the Enterprise did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

(f)     The amount of the Daily Payments was determined based upon when the Enterprise wanted to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(g)     The Enterprise assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the agreements;

(h)     The Enterprise required that the merchants to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables.

(i)     The Enterprise required that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew were breached from day one.

### THE UNDERLYING FTE TRANSACTIONS

A.     **Texas Medical Supply.**

54.     Texas Medical is an expert in the sale and distribution of medical equipment. It offers a variety of products for care and health care, focusing on meeting the needs of patients and professionals. It provides a selection of national and imported medical equipment within a wide range of categories regardless of the branch or line of business. It serves all market sectors: individuals, rural clinics, urban clinics, clients of small and medium-sized companies, as well as large hospitals and corporations, both nationally and internationally.

55.     Texas Medical also partners with local area churches, Native American tribes (through joint ventures) and hospitals and employs veterans, second chancers and legal refugees.

56.     Its core mission is to combat the pandemic utilizing domestic resources to help create jobs and solve our nation's dependence on foreign countries when it comes to personal protective equipment.

57.     As a direct result of the pandemic, Texas Medical found itself in desperate need of cash to keep up with customer demands and supply constraints, especially from first responders, frontline workers and hospitals.

58.     Enter the merchant cash advance companies.

59.     Unable to secure necessary financing based on its current revenue stream, Texas Medical and its individual owners were offered quick, short-term financing by numerous MCAs due to a large contract Texas Medical secured with the U.S. Defense Logistics Agency (the "DLA"), which was to pay Texas Medical $380 million over a 12-month period.

60.     One of the MCAs was Spin Capital.

61.     Texas Medical entered into its first transaction with Spin Capital on May 25, 2021.  On the face of the agreement, Spin Capital advanced Texas Medical $750,000 (the "Purchase Price") but required Texas Medical to payback a total of $1,200,000 (the "Purchased Amount") over just sixteen weeks.  To be sure, the agreement requires fixed weekly payments of $75,000.  Simple math demonstrates that the intended term on its face was just 16 weeks ($1,200,000/$75,000=16).

62.     On its face, the agreement translates into an annual interest rate of nearly 200% per annum, nearly 8 times the maximum 25% rate permitted under New York Penal Law.

63.     In or around June 2021, Texas Medical learned that its contract with the DLA had been put on pause, thus requiring it to take an additional short-term loan from Spin Capital.

64.     On June 16, 2021, Texas Medical entered into a second agreement with Spin Capital.  On its face, Spin Capital agreed to advance $160,000 (the "Purchase Price") but required Texas Medical to payback a total of $239,840 (the "Purchased Amount") over just sixteen weeks.  To be sure, the agreement requires fixed weekly payments of $15,000.  Once again, simple math demonstrates that the intended term on its face was just 16 weeks ($239,840/$15,000=16).

65.     On its face, the agreement translates into an annual interest rate of nearly 200% per annum, nearly 8 times the maximum 25% rate permitted under New York Penal Law.

66.    In or around September 2021, Texas Medical was informed that the DLA had canceled its contract, leaving Texas Medical unable to pay the unlawful interest demanded by Spin Capital.

67.    As a result, Texas Medical and its individual owners attempted to negotiate a long term payoff of the loan amount that would both repay Spin Capital a reasonable interest rate and allow Texas Medical to stay in business and continue to employ local area veterans, second chancers and foreign refugees.

68.    When Texas Medical informed Spin Capital that it needed more time to pay, Spin Capital unleashed its collection arm and sent out a stream of UCC Lien Notices to various customers and vendors, many of which did not owe receivables to Texas Medical at all.  Rather, Spin Capital sent out the UCC Lien Notice without any good-faith basis to believe that the recipient held accounts receivable owed to Texas Medical.

69.    The sending of these UCC Lien Notices caused immense harm and resulted in the loss of customers, accounts, revenues and profits, making it even more impossible to pay the extortionate demands of Spin Capital.

70.    Ultimately, on or around December 28, 2021, Texas Medical had reached an agreement with Spin Capital, wherein Texas Medical would payback an additional $1.4 million over a period of two years.  The agreement was confirmed in writing by counsel for both Spin Capital and Texas Medical.

71.    Nevertheless, after Texas Medical signed, executed and returned the agreement, Spin Capital recanted its settlement agreement at the direction of Lubin.

72.    Instead of extracting a lawful interest rate of 25%, Lubin demanded an unlawful interest rate in excess of 42%.

16

## FIRST CAUSE OF ACTION

### (RICO:  18 U.S.C. § 1962)

73.     Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

**A.      The Unlawful Activity.**

74.     More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

75.     In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

76.     As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp*., 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

77.     As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

78.     This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

79.     As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

80.     The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

81.     Like here, this was a purely artificial device used by the loanshark to evade the law—an evasion that the Legislature sought to prevent.

82.     Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

**B.      Culpable Person.**

83.     Lubin is a "person" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that he is an individual capable of holding a legal interest in property.

84.     At all relevant times Lubin was, and is, a person that exists separate and distinct from the Enterprise, described below.

85.     Lubin has an ownership interest in Spin Capital and is the mastermind of the Enterprise.

86.     Through his operation of Spin Capital, Lubin solicits, underwrites, funds, services and collects upon lawful debt incurred by small businesses in states that do not have usury laws.

**C.      The Enterprise.**

87.     Spin Capital and its Investors, including Joel Getter, constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

88.     Spin Capital and its Investors are associated in fact through relations of ownerships for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting

upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

89.    Since at least 2019 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

90.    The debt, including such debt evidenced by the Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.

91.    Since at least 2019 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

92.    The Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1).  Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**D.    The Roles of the RICO Persons in Operating the Enterprise, and the roles of  the individual companies within the Enterprise.**

93.    The RICO Person has organized himself and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order

to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

      **i.**      **Avrumi Lubin**

94.      Lubin is an owner and the mastermind of the Enterprise. Together with Getter, Lubin is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

95.      In his capacity as the mastermind of the Enterprise, Lubin, together with Getter, is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations. All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to Texas Medical.

96.      Lubin has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

97.    Lubin has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to Yellowstone, Stern, Davis, MCA Recovery and to the Investors of the deals in which he has personally participated.

98.    **ii.    Joel Getter**

99.    Getter is an owner of Spin Capital.  Together with Lubin, Getter is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

100.    In his capacity as the day-to-day leader of the Enterprise, Getter, together with Lubin, is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans.

101.    Getter has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, soliciting and recruiting members of the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

102.    Getter has ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the Enterprise.

**iv.    Spin Capital**

103.    Spin Capital is organized under the laws of New Jersy and maintains officers, books, records, and bank accounts independent of Lubin and the Investors.

104.    Lubin, Getter and the Investors have operated Spin Capital as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud. Pursuant to its membership in the Enterprise, Spin Capital has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with Investors to fund the usurious loans; (ii) pooled the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtained judgments in its name to further collect upon the unlawful debt.

105.    In this case, Spin Capital, through Defendants: (i) solicited borrowers; (ii) pooled funds from Investors to fund the Agreements; (iii) underwrote the Agreements; (iv) entered into the Agreements; and (v) collected upon the unlawful debt evidenced by the Agreements by effecting wire transfers from the bank accounts of Texas Medical.

**v.    The Investors**

106.    The Investors are a group of organizations and individual investors who maintain separate officers, books, records, and bank accounts independent of Lubin, Getter and Spin Capital.

107.    Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing Spin Capital with all or a portion of the pooled funds necessary to fund the usurious loans, including the Agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

108.    The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

### E.    Interstate Commerce

109.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

110.    Specifically, members of the Enterprise maintain offices in New Jersey and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in Texas, including Texas Medical, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

111.    In the present case, all communications between the members of the Enterprise, and Texas Medical were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the Agreements, fund the advances under each of the Agreements and collect the payments via interstate electronic ACH debits.

112.    In addition, at the direction of Defendants, each of the Agreements was executed in states outside of New Jersey, and original copies of the Agreements were sent from Texas and Pennsylvania to the Enterprise, through Defendants, at their offices in New Jersey via electronic mail.

**F.    Injury and Causation.**

113.    Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

114.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars in improperly collected criminally usurious loan payments and the unlawful entry and enforcement of judgments.

115.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

116.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

<u>**SECOND CAUSE OF ACTION**</u>
**(Conspiracy under 18 U.S.C. § 1962(d))**

117.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

118.    Defendant has unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed with members of the Enterprise to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

119.    By and through each of the Enterprise Member's business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent

email communications among the Defendant and the Enterprise Members concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreements, Defendant knew the nature of the Enterprise and Defendant knew that the Enterprise extended beyond each Enterprise Member's individual role.  Moreover, through the same connections and coordination, Defendant knew that the other Enterprise Members were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

120.    Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c).  In particular, Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Enterprise Members shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements.

121.    Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

122.    The participation and agreement of Defendant and each Enterprise Member was necessary to allow the commission of this scheme.

123.    Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing.

25

124.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, improperly collected loan payments, lost customers, loss of goodwill, and lost profits.

125.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

126.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendant, and seek an Order:

a)    Declaring each of Plaintiffs' agreements with Defendants to be a usurious loan in violation of New York Penal Law §190.40 and thus void and unenforceable;

b)    Awarding compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be determined at trial;

c)    Awarding treble damages;

d)    Requiring Defendants to pay Plaintiffs' attorneys' fees and costs; and

e)    Any further relief deemed appropriate by the Court.

Dated:  January 7, 2022

**WHITE AND WILLIAMS LLP**

By: _____

Shane R. Heskin
1650 Market Street, Suite 1800
Philadelphia, PA 191023
(215) 864-6329
heskins@whiteandwilliams.com
*Attorneys for Plaintiffs*

26